# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DIANE DENT,                 )

                            )

        **Plaintiff,**       )

                            )

        **v.**              )     **No. 13 C 4452**

                            )

**CAROLYN W. COLVIN, Acting**    )     **Magistrate Judge Finnegan**

**Commissioner of Social Security,**   )

                            )

        **Defendant.**     )

## MEMORANDUM OPINION AND ORDER

Plaintiff Diane Dent seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. 42 U.S.C. §§ 423(d), 1381a. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and filed cross-motions for summary judgment. After careful review of the record, the Court now grants Plaintiff's motion, denies the Commissioner's motion, and remands this case for further proceedings.

## PROCEDURAL HISTORY

Plaintiff filed her initial application for DIB on November 30, 2009, alleging that she became disabled on July 25, 2009, due to rheumatoid arthritis, high blood pressure, and vitamin D deficiency. (R. 167-68; 192). The Social Security Administration ("SSA") denied Plaintiff's claims initially on March 17, 2010, and upon reconsideration on August 18, 2010. (R. 105). After Plaintiff's timely request, Administrative Law Judge ("ALJ") Marlene R. Abrams held an August 2, 2011 hearing in this matter. (R. 19; 36). Plaintiff,

who appeared with counsel, testified at the hearing, as did Randall L. Harding, a vocational expert ("VE"), and Dr. Sheldon Slodki, a medical expert ("ME"). (R. 36-103).

Several months after the hearing, on March 29, 2012, the ALJ found Plaintiff is not disabled because she is capable of performing light work, including her past relevant work as a medical records clerk and as an inventory control clerk. (R. 19-31). On April 24, 2012, Plaintiff requested review of the ALJ's decision, and on April 19, 2013, the appeal was denied. (R. 6-10; 15). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

In support of her request for remand, Plaintiff argues that the ALJ erred: (1) by finding that her impairments or combination of impairments do not meet or medically equal Listing 14.09 for inflammatory arthritis; (2) in analyzing the medical opinions of her treating internist, Dr. Irene Aluen,[1] DDS consulting physician Dr. George Andrews, and the ME, Dr. Sheldon Slodki; (3) by improperly determining her residual functional capacity ("RFC"); and (4) in making a flawed credibility assessment.

## FACTUAL BACKGROUND

Plaintiff was born on February 18, 1955, and was 56 years old at the time of the hearing in this matter. (R. 43-44). Plaintiff lives in an apartment with her daughter, son-in-law, and seventeen-year-old grandson. (R. 65-66). She earned a GED and also received certificates in medical records and word processing at a training school. (R. 44-45). Plaintiff worked as a word processing operator for nine years, as a medical records clerk for about three years, and then as an inventory clerk dealing with airplane parts beginning in September 2006. (R 46-53; 193). She was laid off from the

---

1    The record indicates that the internist's full name is Dr. Irene Aluen Metzner, but the parties refer to her as "Dr. Aluen," and thus so shall the Court.

inventory clerk job on April 17, 2009, due to a downturn in the economy. (R 46-53; 193).

Shortly after being laid off, Plaintiff began receiving unemployment benefits, which lasted until mid-2010. (R. 21; 46-47). While she received those benefits, Plaintiff applied for jobs in customer service and attended some interviews for inventory clerk jobs, but did not obtain employment. (R. 46-47). In late July 2009, Plaintiff began experiencing pain, soreness, stiffness, and swelling in her hands and ankles, and was eventually diagnosed with arthritis (R. 53-54; 86).

## A. Medical History

### 1. 2009

The first available medical records are from Plaintiff's August 20, 2009 emergency room visit at Loyola Hospital, a couple of weeks after the date Plaintiff allegedly became disabled. (R. 264-72). Plaintiff complained of severe pain in her ankles and hands for a couple of days, and reported experiencing similar pain a couple of weeks prior. (R. 266). She also indicated that she had needed assistance walking because of the pain. (R. 267.). On examination, Plaintiff displayed erythema (redness of the skin), mild warmth and swelling in the left ankle. (*Id.*). The attending physician ordered a metabolic panel and other labs, but found nothing concerning. (R. 267-271). Plaintiff was injected with a pain killer to relieve her immediate pain, and was discharged from the emergency room the next day with orders to take Naprosyn for pain. (R. 266; 272). At discharge, Plaintiff denied pain or discomfort, and ambulated with a normal gait. (R. 266).

A week later, on August 27, 2009, Plaintiff visited another emergency room at Stroger Hospital. (R. 430-33). She told the attending physician, Dr. David Levine, that the Naprosyn she had been given helped her pain, but she still experienced wrist and ankle pain that were worse with activity and in the morning. (*Id.*). Dr. Levine found Plaintiff had a full range of motion and normal strength in both her ankles, although there was some redness in her left ankle and tenderness in the right. (R. 430). Dr. Levine also noted decreased strength and range of motion in the left wrist, and ordered left wrist and left ankle x-rays. (R. 430, 433). The x-rays are not in the record, but Dr. Levine's notes described the wrist x-ray as "unremarkable," and his note regarding the ankle x-ray is illegible. (R. 433). Dr. Levine diagnosed Plaintiff with polyarthritis, recommended she be discharged, prescribed ibuprofen for pain, and referred her for a follow-up at the Stronger Musculoskeletal Clinic. (R. 431, 433).

A few weeks later, on September 10, 2009, Plaintiff returned to the emergency room at Loyola Hospital, complaining of neck and cervical spine pain. (R. 253-63). She was asked about her arthritis, and denied any hand pain. (*Id.*). She also had no redness, swelling or deformities, and had a full range of motion and strength in all extremities. (*Id.*). Plaintiff had a CT scan of the head and neck which showed a small amount of mild inflammation in the back of the neck. (R. 255; 261). Plaintiff was given some morphine for pain, and refused any more diagnostic procedures or treatments, stating that her pain was resolved with the morphine. (*Id.*). She told the emergency room attending physician that she "felt much better," and she thought her pain was probably caused by having "slept wrong." (*Id.*). Plaintiff was then discharged, and was

encouraged to establish a primary care physician rather than continue being treated at emergency rooms.  (*Id.*).

About a month later, on October 13, 2009, Plaintiff began seeing Dr. Aluen at Logan Square Health Center, to establish primary care.  (R. 331-35).  Plaintiff described her ankle and wrist pain history to Dr. Aluen, and complained at that time of pain and stiffness in the hands and ankles that was worse in the mornings and lasted all day.  (R. 331).  Plaintiff stated her pain was then at a 2 on a scale of 1 to 10, 10 being the worst.  (R 335).  She was also wearing a wrist brace that she said relieved her pain.  (*Id.*).  Plaintiff also complained of fatigue.  (R. 398).

Dr. Aluen found no redness in any of Plaintiff's joints, but found synovitis (inflammation of the synovial membrane)[2] in her distal interphalangeal joints, proximal interphalangeal joints,[3] wrists, and ankles.  (*Id.*).  The doctor also noted that Plaintiff had significantly elevated blood pressure.  (R. 333).  Dr. Aluen also wrote that Plaintiff's wrist and ankle x-rays from August 2009 were "unremarkable."  (*Id.*).  Based on her findings, the doctor diagnosed Plaintiff with polyarthralgia (pain in several joints) and indicated a preliminary diagnosis of rheumatoid arthritis.  (*Id.*).  She prescribed Prednisone for Plaintiff's inflammation, Tylenol #3 for pain, and a blood-pressure medication.  (*Id.*).  Dr.

---

2       "Synovial membrane" refers to the "connective-tissue membrane that lines the cavity of a joint and produces the synovial fluid."  http://www.thefreedictionary.com/synovial+membrane (all websites in this opinion were last visited September 2, 2014).

3 "Distal interphalangeal joints" refers to "the synovial joints between the middle and distal phalanges         of         the         fingers         and         of         the         toes."         http://medical-dictionary.thefreedictionary.com/distal+interphalangeal+joints.   "Proximal interphalangeal joints" refers to "the synovial joints between the proximal and middle phalanges of the fingers and of the         toes."         http://medical-dictionary.thefreedictionary.com/proximal+interphalangeal+joints. "Phalanges"         refers         to         "the         bones         of         the         fingers         and         toes."         http://medical-dictionary.thefreedictionary.com/phalanges.

Aluen also referred Plaintiff to Stroger for various lab work, and a follow-up that the doctor later rescheduled. (*Id.*).

Dr. Aluen reviewed the results of Plaintiff's lab work on October 27, 2009, and noted they showed Plaintiff had mild pancytopenia, and an elevated rheumatoid factor.[4] (R. 398-404). Dr. Aluen then called Dr. John Case, a rheumatologist at Stroger, and discussed Plaintiff's conditions with him. (*Id.*). The doctors determined Plaintiff's joint pain suggested a rheumatologic condition, but her pancytopenia and fatigue could also be due to a hematological, or blood-related, malignancy. (*Id.*). The doctors scheduled Plaintiff for additional lab work and follow-ups. (*Id.*).

After the lab work was completed, Plaintiff met with Dr. Aluen on November 13, 2009. (R. 328; 395-97). Plaintiff told Dr. Aluen that the Prednisone did not help her pain, so she stopped taking it. (R. 328). Plaintiff also said that she could not afford to purchase her blood pressure medication. (*Id.*). Upon evaluation, Plaintiff presented the same synovitis issues as before, and now had swelling in the sternoclavicular joint.[5] (*Id.*). Dr. Aluen also noted that Plaintiff's autoimmune panel was negative and her other lab results were normal, except she had a rheumatoid factor of 61. (*Id.*). Dr. Aluen recommended additional labs to further investigate Plaintiff's pancytopenia. (*Id.*). Those lab results showed Plaintiff had iron deficiency anemia. (R. 389-93). Dr. Aluen then recommended Plaintiff have additional testing at the emergency room so that her physicians could determine whether the anemia was related to her arthritis. (*Id.*).

---

4      "Pancytopenia" refers to a "reduction in the number of red blood cells, white blood cells, and platelets." http://medical-dictionary.thefreedictionary.com/pancytopenia.

5      "Sternoclavicular joint" refers to "the synovial articulation between the medial end of the clavicle and the manubrium of the sternum and cartilage of the first rib." http://medical-dictionary.thefreedictionary.com/sternoclavicular+joint.

Plaintiff declined to go to the emergency room, and also did not show up for an initial consultation scheduled with Dr. Case around this time, for reasons not explained by the record. (R. 387-88; 425).

Plaintiff did show up for her scheduled appointment at the Musculoskeletal Clinic at Stroger, on November 25, 2009. (R. 429). She met with Dr. Steven A. Clar, a physical medicine specialist. (R. 428). Plaintiff explained her medical history, and Dr. Clar reviewed Plaintiff's August 2009 x-rays. (*Id.*). The doctor found Plaintiff's left ankle x-ray showed mild soft tissue swelling, but his physical examination revealed no swelling in her joints. (*Id.*). He also observed Plaintiff was using a splint for her wrist, and told her to avoid using it. (*Id.*). Dr. Clar diagnosed Plaintiff with polyarticular arthritis, and found she "likely" had rheumatoid arthritis since she met 3 of the 7 criteria, or 4 of 7 when taking into account her history of swelling. (*Id*). The doctor referred Plaintiff for x-rays of both hands, gave her a handout on paraffin wax treatments, recommended ibuprofen for pain, and asked her to return in two months. (*Id.*).

Plaintiff had the hand x-rays done at Stroger after meeting with Dr. Clar. (R. 288-89; 384-86). The x-rays showed mild joint space narrowing in the distal interphalangeal joints bilaterally, with minimal productive changes and normal carpal alignment as well as mid-carpal joints.[6] (R. 288). The radiologist's impression was osteoarthritis, with no evidence of inflammatory arthropathy. (*Id.*). It does not appear, however, that Plaintiff ever returned to the Musculoskeletal Clinic, or that Dr. Clar ever reviewed these x-rays, and the record reveals no explanation for the reasons why. A few days after her visit to

---

6    "Carpal" refers to the carpus, or wrist, and its related bones.    http://medical-dictionary.thefreedictionary.com/carpal.

the Musculoskeletal Clinic, on November 30, 2009, Plaintiff applied for DIB with the SSA. (R. 167-68).

## 2. 2010

Plaintiff's next treatment records are from January 27, 2010, when she first met in person with Dr. Case. (R. 425-27). Plaintiff told Dr. Case that she had pain even when taking Tylenol #3, but that paraffin wax treatments with occasional ibuprofen controlled her pain. (R. 426-27). Plaintiff further complained that her "main issue" was the limitations in her daily functioning caused by the pain in her hands. (R. 427). Dr. Case examined Plaintiff and found she had swelling and tenderness in her finger joints, wrists and ankles; a decreased range of motion in the fingers, wrists and ankles, grip strength of 4 out of 5; and she was unable to fully flex her interphalangeal joints. (*Id.*). The doctor also reviewed Plaintiff's medical records, including her hand x-rays from August and November 2009. (R. 426). Dr. Case found that Plaintiff's hand x-rays showed she likely had osteoarthritis, but her left ankle x-ray was normal. (*Id.*). Dr. Case's initial impression was "presumed rheumatoid arthritis," as well as pancytopenia and iron deficiency. (R. 426-27). The doctor recommended Plaintiff continue the paraffin wax treatments, try Prednisone again and begin taking Plaquanil for her pain and swelling. (R. 427). Dr. Case also recommended Plaintiff have her labs done, and that she return in March. (R. 378-80; 427).

On February 2, 2010, a few days after meeting with Dr. Case, Plaintiff had a follow-up with Dr. Aluen. (R. 325-27). Plaintiff said her joint pain was somewhat improved, and Dr. Aluen found she had tenderness in her hand and ankle joints, but no

longer had effusion.[7]  (*Id.*).  Dr. Aluen also referred Plaintiff for a CT scan related to kidney issues, but Plaintiff's sister accidently cancelled the appointment.  (R. 367; 376-77).

A few days later, on February 4, 2010, Plaintiff developed a skin infection in her right elbow and arm, for which she received treatment at Saints Mary and Elizabeth Medical Center.  (R. 292-309).  On February 9, 2010, Plaintiff followed-up with Dr. Aluen on the skin infection, and that doctor noted that Plaintiff no longer had any visible redness and swelling in her right arm, and the infection was "resolving."  (R. 319).  Plaintiff told the doctor she had been prescribed antibiotics, but she could not afford them.  (*Id.*).  Dr. Aluen encouraged Plaintiff to apply for Medicaid, as she could "not imagine [Plaintiff] would not qualify for" the benefits because "her symptoms are severe and disabling."  (*Id.*)

Shortly thereafter, on February 16, 2010, Dr. Aluen filled out an "Arthritis Residual Functional Capacity Questionnaire" in support of Plaintiff's DIB claim.  (R. 442-444).  In the form, Dr. Aluen explained that she had seen Plaintiff five times since October 2009 as her primary care provider.  (*Id.*).  The doctor wrote that Plaintiff had been diagnosed with inflammatory arthritis, anemia, high blood pressure, and potentially rheumatoid arthritis, for which she was seeing a rheumatologist.  (*Id.*).  Under prognosis, Dr. Aluen wrote that it was unclear at this point whether Plaintiff actually had rheumatoid arthritis or whether the condition would respond to drugs.  (*Id.*).  Dr. Aluen explained that Plaintiff's symptoms included generalized joint pain, a reduced range of motion at "all limb points," and tenderness.  (R. 442).

---

7  "Effusion" refers to "[t]he escape of fluid from the blood vessels or lymphatics into the tissues or a cavity."  http://medical-dictionary.thefreedictionary.com/effusion.

In regards to Plaintiff's capabilities, Dr. Aluen wrote that Plaintiff could walk two city blocks slowly without rest or pain, and could sit for at least six hours in an eight-hour work day, including for more than two hours at a time before needing a break. (R. 443). On the other hand, the doctor wrote that Plaintiff could only stand for about 15 minutes at a time and for less than two hours total in a work day. (*Id.*). Dr. Aluen also opined that Plaintiff required a job in which she could sit or stand at will because "[i]f she gets tired from standing, she must be allowed to sit down." *Id.* Dr. Aluen also wrote that Plaintiff could only occasionally lift up to ten pounds, and has significant limitations in doing repetitive reaching, handling or fingering because of joint pain limiting her movements. (R. 444). The doctor also expected Plaintiff to be absent from work about two days per month "in a good month," and wrote that "her illness may flare and require more frequent absence." (*Id.*).

A couple of weeks later, on March 2, 2010, Plaintiff had a follow-up with Dr. Case. (R. 424). Plaintiff reported that she was taking her medications, and still had stiffness and pain from the hands that was "shooting" up her arms, but her pain had improved considerably (going from a 10 out of 10, to a 4 out of 10) and she was feeling "much better." (*Id.*). Dr. Case also noted Plaintiff had decreased finger stiffness. (*Id.*). He recommended Plaintiff return in May, and also visit the Stroger Hematologic Clinic due to signs of leukopenia, or a low white blood cell count, in her recent lab work results. (*Id.*).

Shortly thereafter, on March 15, 2010, Dr. George Andrews completed a physical RFC assessment for DDS related to Plaintiff's DIB claim. (R. 310-317). Dr. Andrews found Plaintiff could occasionally lift up to 20 pounds, frequently lift up to 10 pounds,

and stand, walk or sit for about 6 hours in an 8 hour work day. (*Id.*). Due to evidence of minor swelling in her lower extremities, Dr. Andrews limited Plaintiff to occasionally climbing ladders, ropes or scaffolds, and occasional kneeling and crawling. (*Id.*). Dr. Andrews found no evidence to support any other limitations. (*Id.*). The doctor specifically noted that Plaintiff's November 2009 x-rays of the hands showed only mild joint space narrowing and no evidence of inflammatory arthropathy, and that her September 2009 examination at the Loyola Hospital emergency room showed she had normal strength in all extremities and a full range of motion in all joints. (R. 317). Shortly after Dr. Andrews' completed his report, on March 17, 2010, Plaintiff's DIB claim was denied by the SSA. (R. 105).

On Dr. Case's referral, Plaintiff saw Dr. Rubenstein, a hematologist at the Stroger Hematologic Clinic, on April 21, 2010. (R. 420). Plaintiff's examination was normal, but Dr. Rubenstein was concerned that Plaintiff's lab work showed her leukopenia had worsened while she was taking medications for her rheumatoid arthritis. (*Id.*). The hematologist suggested that Plaintiff's physicians consider alternative treatments for her arthritis. (*Id.*). He scheduled Plaintiff for a follow-up in May, but she missed it. (*Id.*).

Plaintiff met with Dr. Case on May 5, 2010, complaining of worsening pain and a decreased range of motion in the hands and wrists, as well as morning stiffness. (R. 437.). Plaintiff also reported compliance with her medications. (*Id.*). Dr. Case's examination showed Plaintiff had a limited range of motion in her fingers and was unable to make a fist; her left wrist was tender to palpation; she had pain with active and passive motion in the right wrist; and she had decreased muscle strength in the wrists. (*Id.*). On the other hand, her elbow, shoulder, knees and ankles were normal, and she

had no swelling or erythema (redness) in the fingers or wrists.  (*Id.*).  In response to Dr. Rubenstein's theory that Plaintiff's medications were affecting Plaintiff's anemia, Dr. Case had her discontinue taking Plaquenil, prescribed Methotrexate and folic acid, and lowered her dosage of Prednisone.  (*Id.*).

On June 2, 2010, Plaintiff followed-up with Dr. Case.  (R. 439).  She stated that she had stopped taking the Methotrexate and folic acid after one week because it upset her gastrointestinal tract.  (*Id.*).  She also continued to complain of finger stiffness and wrist pain and stiffness.  (*Id.*).  Dr. Case noted Plaintiff had mild tenderness to palpation in the wrists and hands, but no swelling.  (*Id.*).  Dr. Case adjusted Plaintiff's medications and asked her to return for a follow-up in a month.  (*Id.*).  Plaintiff then returned on July 7, 2010, complaining of continued pain and stiffness that was somewhat relieved with exercises and aspirin.  (R. 463).  Upon examination, Plaintiff's wrists showed pain with range of motion testing, but no swelling or pain on palpation.  (*Id.*).  Plaintiff's hands also showed no swelling or deformities and she had normal strength.  (*Id.*).  Dr. Case wrote that Plaintiff's polyarthritis was atypical, and still thought it was "possibly" rheumatoid arthritis.  (*Id.*).  The doctor also considered, but "doubt[ed]," that Plaintiff had Felty's syndrome, but suggested she return to the Hematologic Clinic for further analysis.[8] (*Id.*).

On Dr. Case's recommendation, Plaintiff went for her overdue follow-up at the Hematologic Clinic on July 2, 2010.  (R. 462).  She met with a new doctor, Dr. Telfer,

---

[8]     "Felty's syndrome" is "a syndrome of splenomegaly with chronic rheumatoid arthritis and leukopenia; there are usually pigmented spots on the skin of the lower extremities, and sometimes there is other evidence of hypersplenism such as anemia or thrombocytopenia." http://medical-dictionary.thefreedictionary.com/Felty%27s+syndrome.  "Splenomegaly" refers to "abnormal enlargement of the spleen." http://www.thefreedictionary.com/splenomegaly. "Thrombocytopenia" is "a blood disease characterized by an abnormally low number of platelets in the bloodstream." http://medical-dictionary.thefreedictionary.com/thrombocytopenia.

and complained of stress, the inability to "move well," and stated that she hoped to return to work.  (*Id.*).  Dr. Telfer noted Plaintiff had mild leukopenia that could potentially be caused by her medications, or possibly another condition, such as Felty's syndrome. (*Id.*).  He recommended she have a complete blood count test and return in one month. (*Id.*).

Plaintiff had a follow-up with Dr. Aluen a few days later, on July 13, 2010.  At that time, Plaintiff admitted to not refilling one of her blood-pressure medications since November 2009, and her high blood pressure reading showed it was unlikely she had taken that medication.  (R. 469).  Plaintiff also reported generalized joint tenderness, and Dr. Aluen found she had pain with range of motion testing in her upper and lower extremity joints, but no effusion or erythema (redness).  (*Id.*).  Dr. Aluen noted Plaintiff had a low white blood cell count according to her recent lab results.  (*Id.*).

Plaintiff's DIB claim was denied on reconsideration on August 18, 2010.  (R. 105).  In follow ups with at the Hematologic Clinic in September and October 2010, Plaintiff had no new complaints, but had not yet undergone the complete blood count test that Dr. Telfer had recommended.  (R. 460-61).  She finally had the testing done in mid-September and scheduled a follow up for October.  (R. 465-66).

A couple of weeks later, on September 29, 2010, Plaintiff saw Dr. Case for a regular follow-up.  (R. 459).  She reported experiencing pain at a rate of 5 out of 10, morning stiffness in the hands that lasted a half day, and arm stiffness that lasted all day.  (*Id.*).  Upon examination, her range of motion in the hands, wrists and ankles was normal, although she had some tenderness in the ankles and pain in the hand joints. (*Id.*).   To determine whether Plaintiff's leukopenia was improving, Dr. Case

recommended that she have her lab work redone before her next visit, set for November. (*Id.*).

On October 13, 2010, Plaintiff returned to the Hematologic Clinic with the complete blood count test results, and met with a new doctor, Dr. Catchatourian. (R. 458). Plaintiff had no swelling in the joints, but did display some "purple discoloration" in the ankles and tenderness on palpitation. (*Id.*). Dr. Catchatourian's impression was mild thrombocytopenia and mild leukopenia, that was probably due to Plaintiff's medications. (*Id.*). The doctor determined there was no need to have Plaintiff undergo any further testing at that time, and instead instructed Plaintiff to return in six months with new lab work results. (*Id.*).

In November and December 2010, Plaintiff visited Dr. Aluen for routine check-ups. (R. 448-50; 500-502). At this time, Plaintiff had some fatigue and joint pain, as well as synovitis at the wrists, but stated her joint pain was improved. (R. 500-02). Dr. Aluen made an appointment for Plaintiff to have a colonoscopy, and noted she had tried to refer Plaintiff previously for this procedure three times. (R. 502). There is no explanation in the record for why Plaintiff required four referrals for this procedure. Dr. Aluen also noted Plaintiff was experiencing postmenopausal bleeding, and scheduled her for an endometrial biopsy to investigate. (R. 448-49; 502). After Plaintiff initially missed the appointment for the biopsy due to confusion regarding the date, she underwent the procedure, which showed her bleeding was benign and was not the cause of her anemia. (R. 476; 482; 488; 502).

### 3.    2011

Plaintiff's first records in 2011 are from a follow-up with Dr. Case on April 15, 2011. (R. 493-96). Dr. Case noted that Plaintiff had missed her November 2010 appointment, and he had not seen her since September 2010. (*Id.*). There is no explanation in the record for the gap in treatment. Plaintiff complained of pain in the wrists going up to her elbows and through her hands, and also in her ankles. (*Id.*). She also complained of stiffness for 6 to 7 hours in the morning, and that her hands lacked both dexterity and strength. (*Id.*). Dr. Case observed Plaintiff had some joint pain and tenderness during her musculoskeletal examination, a decreased range of motion in the wrist, fingers and shoulder, and the inability to squeeze her fingers. (*Id.*). Nevertheless, Plaintiff was able to clasp her hands, and had no swelling in any joints. (*Id.*). Dr. Case also noted that the pharmaceutical records showed Plaintiff was not likely as compliant with her medications as she reported. (R. 493; 496).

Dr. Case noted that the Hematologic Clinic had determined that Plaintiff's low white blood cell count was due to her arthritis medications. (R. 495; 502). But, since Plaintiff did not have timely lab work done, the doctor could not evaluate whether the medication use was causing her hematological issues. (R. 495). Dr. Case also noted that Plaintiff showed some symptomology of rheumatoid arthritis, but it was "mild and apparently inactive today." (R. 494-96). Overall, Dr. Case felt that Plaintiff's diagnosis was unclear, and it was particularly complicated by her not-fully explained leukopenia and cytopenia. (R. 494-95). The doctor recommended Plaintiff undergo hand x-rays and updated lab work, follow-up with the Hematologic Clinic, and return in mid-June.

(R. 496). Dr. Case also wrote that he did not feel Plaintiff "is disabled at this time pending x-rays or a hematological disease." (*Id.*).

After having some problems with the Hematologic Clinic declining to schedule an appointment for her, Plaintiff was finally able to follow-up at that clinic on May 4, 2011. (R. 479; 495). At that time, it appears she met with a new doctor, whose name is not legible in the record. (R. 479). Plaintiff was in no acute distress and denied fatigue. (*Id.*). The doctor noted that Plaintiff's recent lab results were within normal limits, and the hematologic disorders seen on previous lab reports was mild and likely caused by her medications. (*Id.*).

A few days later, on May 13, 2011, Plaintiff saw Dr. Aluen, seeking help with a Medicaid form. (R. 481-82). Plaintiff told Dr. Aluen that she can usually walk for about 10 minutes without stopping, but stated that on some days when her disease flares up, she "gets tired." (*Id.*). Plaintiff described pain in her upper and lower extremities, but Dr. Aluen found no synovitis. (*Id.*). Dr. Aluen noted that a diagnosis of inflammatory arthropathy was questionable at that time. (*Id.*).

On June 15, 2011, Plaintiff went for her scheduled follow-up with Dr. Case. (R. 484-87). She complained of pain in her wrists that traveled up to her elbows, pain in her ankles, and morning stiffness that lasted throughout the day. (*Id.*). She also stated she was not sure which medications she was taking. (*Id.*). The doctor thought it likely that Plaintiff was non-compliant with her medications based on her statements and the pharmaceutical records he had. (*Id.*). Upon examination, Dr. Case found Plaintiff had normal strength, no swelling, deformities, or synovitis, and a normal range of motion in the ankles, despite some pain. (*Id.*). The doctor was unable to assess Plaintiff's range

of motion in her hands and wrists due to pain; Plaintiff stated her pain was about a 2 or 3 out of 10. (*Id.*). Dr. Case also reviewed Plaintiff's recent x-rays, finding that they showed narrowing of the distal interphalangeal joints and proximal interphalangeal joints (these x-rays are not in the record). (*Id.*). However, the doctor determined Plaintiff's arthritis was "improved" and there was "no evidence of acute arthritis." (*Id.*). Plaintiff's pancytopenia also appeared to be improving. (*Id.*). Dr. Case's medical notes from this visit were the most recent notes in the record.

**B.    Testimony/Reports**

**1.    Plaintiff's Function Reports and Testimony**

Plaintiff provided function reports dated February 22, 2010 and July 15, 2010, related to her DIB claim. (R. 199-209; 229-237). In her February 22, 2010 report, she stated she was unable to use her hands for two hours upon waking, but was then able to bathe, dress, prepare quick meals, and do light chores. (R. 199-209). She bathes with a stool, and, when cooking, required help with holding pans and pots and opening jars. (*Id.*). Plaintiff generally spent her time resting and napping, doing light chores, watching television, and doing her recommended exercises and treatments, including daily paraffin bath treatments. (*Id.*). She has trouble writing checks and handling money, because of difficulty using her hands to write and grasp coins. (R. 202-03).

Although Plaintiff can walk for a block or two before needing to rest, she only leaves the home for necessary tasks, such as doctor's appointments or bi-weekly, light shopping trips. (R. 204). She also noted that she sometimes uses a cane, but stated it was not prescribed by any doctor. (R. 205). Plaintiff's July 15, 2010 report describes similar activities, except she stated that she stopped using her cane because it was

hurting her wrists when leaning on the cane.  (R. 235).  Notably, the handwriting on the reports differs from page to page, including that some sections are in all capital letters while others are not.  (R. 199-209; 229-237).  It is not clear if each page was written by the same person, or which, if any, portions were written by Plaintiff.

At the hearing, Plaintiff testified that her arthritis affects her in both hands, both ankles, and her shoulder, causing pain, swelling and stiffness.  (R. 53-54).  She claimed her arthritis had progressively worsened in the year before the hearing.  (R. 54). Plaintiff also has a vitamin D deficiency and high blood pressure, both of which are controlled with medication.  (R. 55-56).  Plaintiff's doctors told her that her white blood cell count was unusual, and she is anemic, which she believes she treats with vitamins. (R. 57-58).  The chronic nature of her illness also makes her depressed.  (R. 57-60).

When asked why she could not work, Plaintiff stated that when she tries to use her hands, her fingers, particularly in her right hand, become stiff, swollen, painful and do not work right.  (R. 60).  The pain radiates to her wrists, creating knots and nodules. (R. 61).  As a result, she is not able to push or pull things with her hands, and has trouble grasping.  (R. 63-64).  Paraffin wax and warm water treatments help, but she cannot afford the wax.  (R. 61-62).  She also uses (and was wearing at the hearing) a wrist brace to "stabilize" her right hand, and it helps a little.  (R. 64-65).  She admitted the brace was not prescribed by her doctors.  (*Id.*).  When asked, Plaintiff testified that her main limitations are the stiffness and pain in the wrists and hands, and "not so much the feet."  (R. 75).

Plaintiff also testified regarding her activities of daily living, including that she bathes and grooms herself, cooks light meals, and does light cleaning such as

sweeping.  (R. 66-67).  Plaintiff's daughter helps her wash and style her hair and helps her get out of the tub.  (R. 68-70, 76).  Plaintiff also uses her arms to manipulate objects, such as drinking glasses and brooms for sweeping, rather than her hands.  (R. 66-67; 80-82).  She also uses a Styrofoam device to help her hold her toothbrush, and brushes by moving her head rather than her wrist.  (R. 66-67, 80-82).

Plaintiff further testified that walking causes her feet to swell, and she can only walk a couple of blocks.  (R. 68-69).  Plaintiff first said she could stand for a couple of hours before needing to sit, and can sit for about a couple of hours before becoming stiff, but equivocated when questioned by her attorney, and said she had not "put [herself] to the test." (R. 68-69; 79-80).  She changed positions due to discomfort during the hearing.  (R. 79-80).  Plaintiff also said that she has a computer, but she only uses it for emailing, and her daughter helps her with the emails.  (R. 45).

Regarding her unemployment compensation, Plaintiff testified that she applied for it right after being laid off on April 17, 2009, and stopped receiving it when it ran out in mid-2010.  (R. 46).  The ALJ asked Plaintiff about her certification to the state unemployment agency during this time that she was willing and able to look for work. (R. 46-47).  Plaintiff explained that she applied for inventory clerk jobs and customer service jobs that she thought she could do.  (*Id.*).  But when she went to interviews for the inventory clerk jobs, she was limping, and was not hired.  (R. 47).  She specifically avoided applying for medical record clerk jobs because they involved tasks she could not do.  (R. 47-48).

## 2. ME Testimony

The ME, Dr. Slodki, testified that he reviewed the entire record and heard Plaintiff's testimony. (R. 86). He stated that Plaintiff was treated by a rheumatologist under a diagnosis of rheumatoid arthritis. (*Id.*). The ME opined that Plaintiff had arthritis in the wrists, hands, ankles and possibly the elbows. (R. 86-87). The ME noted that the record contained evidence of thrombocytopenia, mild leukopenia and anemia, and that pancytopenia is a feature of rheumatoid arthritis, but found that her conditions were not severe enough to meet any listing. (R. 87).

The ME also discussed that Plaintiff's main difficulty appeared to be with fine and gross manipulation, but the medical records did not substantiate that she met a listing based on limitations in manipulations, nor did the records substantiate the severity of symptoms she testified about. (R. 89-91). Plaintiff's testimony described progressively worsening symptoms that were significantly severe, and if she was credible, she was reduced to "less than sedentary" abilities. (*Id.*).

When questioned by Plaintiff's attorney, the ME confirmed that Plaintiff's arthritis could cause the severity of the symptoms that she testified about, that the record showed findings of arthritis in the hands, and that the disease could have "flares, with increases and decreases." (R. 93). Regarding Plaintiff's treatment history, the ME stated that her physicians had decreased some of her treatment due to side effects, and generally her treatment has remained the same over time. (R. 91-92). The ME noted that Plaintiff's prescribed levels of medication were "not very high." (R. 92).

### 3.    VE Testimony

The VE testified that Plaintiff had worked as a word processor at the sedentary level, as a medical records clerk at the sedentary level (although the Dictionary of Occupational Titles ("DOT") listed the job as light work), and as an inventory control clerk at the light into the medium level (the DOT listed that job as medium).  (R. 95-96). All of the jobs were semi-skilled.  (*Id.*).  The VE testified that a hypothetical person who could perform light work, of Plaintiff's age, education and work experience, with limitations to occasionally climbing ladders, ropes, scaffolds and kneeling and crawling, would be capable of Plaintiff's past work as a word processor and medical records clerk. (R. 96).  The person would also be capable of Plaintiff's past work as an inventory control clerk, if performed at the light level. (*Id.*).

If the person were limited to never crawling, kneeling, climbing ropes or scaffolds; occasionally stooping, crouching, and climbing ramps or stairs; avoiding exposure to environmental pollutants, moving machinery and unprotected heights; and only frequent gross and fine manipulations, they would be capable of the work of a medical records clerk.  (R. 97).  They would also be capable of Plaintiff's past work as an inventory clerk if performed at the light level, but not as performed in the national economy.  (*Id.*).  If the person was reduced to occasional gross and fine manipulations, the person would not be able to perform any of Plaintiff's past work.  (R. 97).

## C.    ALJ's Decision

In the ALJ's subsequent March 29, 2012 decision, she wrote that Plaintiff suffered from a severe impairment, rheumatoid arthritis, and the following non-severe impairments:  hypertension, depression, anemia, leukopenia, and tuberculosis  (R. 21-

22).  The ALJ found that the Plaintiff's impairments, or a combination thereof, do not meet or medically equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 22; 30).  The ALJ further determined that Plaintiff was capable of light work and frequent fine and gross manipulations, but should never climb ladders, ropes, or scaffolds, crawl or kneel, and could only occasionally climb ramps and stairs, stoop and crouch.  (R. 22).  The ALJ also found that Plaintiff must avoid exposure to environmental pollutants, moving machinery, and unprotected heights.  (*Id*.).  Relying on the VE's testimony, the ALJ determined that Plaintiff was able to perform her past relevant work as a medical records clerk and as an inventory control clerk.  (R. 31).

## DISCUSSION

### A.    Standard of Review

Judicial review of the ALJ's decision, which constitutes the Commissioner's final decision, is authorized by Section 405(g) of the Social Security Act.  *See* 42 U.S.C. § 405(g).  That decision will be upheld "so long as it is supported by 'substantial evidence' and the ALJ built an 'accurate and logical bridge' between the evidence and her conclusion. *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014) (quoting *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009)).  An ALJ need not mention every piece of evidence in her decision, as long as she does not ignore an entire line of evidence that is contrary to her conclusion.  *Id.*  (citing *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012)).  Although the Court will not reweigh the evidence or substitute its judgment for that of the ALJ, a decision that "lacks adequate discussion of the issues will be remanded."  *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014); *see also id.* (the

ALJ's articulated reasoning must be sufficient to allow the reviewing court to assess the validity of the agency's findings and afford a claimant meaningful judicial review).

**B.     Five-Step Inquiry**

To qualify for DIB under Title II of the Social Security Act, a claimant must establish that she suffers from a "disability" as defined by the Act and regulations. *Infusino v. Colvin,* 12 CV 3852, 2014 WL 266205, at *7 (N.D. Ill. Jan. 23, 2014); *Gravina v. Astrue*, 10-CV-6753, 2012 WL 3006470, at *3 (N.D. Ill. July 23, 2012).   A person is disabled if she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.   42 U.S.C. § 423 (d)(1)(A); *see also Infusino,* 2014 WL 266205, at *7; *Gravina*, 2012 WL 3006470, at *3.

In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed?   (2) Is the claimant's impairment severe?   (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?   (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work?  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Simila*, 573 F.3d at 512-13 (citing *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000)).

**C.     Listing 14.09(B)**

Plaintiff first argues that the ALJ should have found at Step 3 that her impairments or combination of impairments met or medically equaled Listing 14.09B.

(Doc. 18, at 2-8; Doc. 33, at 13-14). Listing 14.09B relates to persons with inflammatory arthritis which results in the following conditions:

Inflammation or deformity in one or more major peripheral joints[9] with:

1. Involvement of two or more organs/body systems with one of the organs/body systems involved to at least a moderate level of severity; and

2. At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).

20 C.F.R. Pt. 404, Subpt. P, Appendix I, § 14.09B. The Listings identify and describe impairments that the SSA considers severe enough to prevent an individual from doing any gainful activity, regardless of age, education, or work experience. 20 C.F.R. § 404.1525(a). Thus, if a claimant's impairment matches or is medically equal to a listed impairment, the claimant is presumed disabled. *Sullivan v. Zebley*, 493 U.S. 521, 525 (1990) (citing 20 C.F.R. § 416.920(d)). The claimant bears "the burden to present medical findings that match or equal in severity all the criteria specified by a listing." *Knox v. Astrue*, 327 F. App'x 652, 655 (*citing Zebley*, 493 U.S. at 531; *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (2006)). "In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (citations omitted).

In this case, the ALJ found that Plaintiff did not have any impairment or combination of impairments that met or medically equaled any listing, including Listing 14.09, and specifically subpart B of that listing. (R. 22). In support, the ALJ wrote that "no treating or examining physician has identified findings equivalent in severity to the

---

9    The "major peripheral joints" are the hip, knee, shoulder, elbow, wrist-hand, and ankle-foot. 20 C.F.R. Part 404 Subpart P Appx 1 (Listings) § 1.00(F).

criteria of any listed impairment," and based on the record, the ALJ found "no reason to conclude otherwise." (*Id.*).  Although the ALJ did not set forth her supporting analysis of the record at Step 3, she did so at Step 4.  (R. 22-31).  In the ALJ's detailed discussion of the record, she noted that Plaintiff suffered from various impairments, including mild leukopenia, anemia and arthritis, but Plaintiff's arthritis, the most limiting of her conditions, was not as severe as Plaintiff claimed.  (R. 22-31).  The ALJ also discussed the ME's testimony, and stated that she gave great weight to the ME's opinion that Plaintiff's impairments did not meet or equal any listing.  (R. 30-31).

Plaintiff argues that the ALJ erred in analyzing whether she met a listing by mischaracterizing evidence, performing a "perfunctory" analysis, and, in particular, by failing to properly assess whether her impairments met or equaled the requirements of Listing 14.09B.  (Doc. 18, at 3-8).  Plaintiff claims the record shows that her impairments met that listing's requirements, including because her arthritis affected her musculoskeletal system to "at least a moderate level of severity," and affected her hematological and endocrine systems.  (*Id.*).  As explained below, the ALJ's assessment was sufficient, logical, and supported by substantial evidence.

Regarding the effects of Plaintiff's arthritis on her musculoskeletal system, Plaintiff cites a handful of items from the record, including excerpts from her x-rays and some of her physicians' examination findings.  (*Id.* at 4-5).  Plaintiff acknowledges that the ALJ considered this evidence and found it supported finding she had some functional capacity limitations.  (*Id.* at 5).  Nevertheless, Plaintiff argues that the ALJ failed to sufficiently explain why the record did not demonstrate that Plaintiff's musculoskeletal system was not involved to a least a moderate level of severity.  (*Id.*).

Contrary to Plaintiff's argument, the ALJ developed an "accurate and logical bridge" from the evidence to the conclusion that Plaintiff's arthritis did not involve any of her body systems, including her musculoskeletal system, to a moderate level of severity. (R. 22). The ALJ explained that there was "limited objective medical evidence" supporting Plaintiff claims regarding the severity of her arthritis symptoms. (R. 28). The ALJ noted that Plaintiff's August 2009 left wrist x-ray was described as "unremarkable," her August 2009 ankle x-ray showed only "mild" soft tissue swelling, and her November 2009 hand x-rays showed only "mild joint space narrowing" and no inflammatory arthropathy. (R. 24-25.).

The ALJ also found that although Plaintiff's physicians periodically observed that she exhibited various symptoms of arthritis, her physicians described her symptoms in mild terms. (R. 27-28.). In particular, both her treating internist, Dr. Aluen, and her treating rheumatologist, Dr. Case, did not find any signs of swelling, heat, redness or inflammation in her joints in their examinations during the four months prior to the hearing. (*Id.*). Dr. Case also described Plaintiff's arthritis as "mild," "inactive, "improved" and "not acute" in the most recent medical records. (*Id.*). The ALJ also discussed the supportive testimony of the ME, including his observations that Plaintiff's arthritis had been treated and controlled with relatively low dosages of medications over time, suggesting that her symptoms "are not particularly serious." (R. 29-31). When reviewing the ALJ's decision as a whole, her conclusion that Plaintiff's impairments did not meet or equal the requirements of any listing is sufficiently explained, and supported by substantial evidence in the record.

Plaintiff raises several arguments against the ALJ's reasoning, none of which have any merit. She first argues that the ALJ "mischaracterized the medical evidence offered by" Drs. Aluen and Case, undermining the ALJ's determination. (Doc. 18, at 3). In support, Plaintiff argues that the ALJ ignored Dr. Aluen's February 9, 2010 remark that Plaintiff would likely qualify for Medicaid because "her symptoms are severe and disabling." (*Id.* at 4 (citing R. 319)). But the ALJ did not ignore Dr. Aluen's February 9, 2010 notes; instead, the ALJ accurately described them as recounting a visit concerning a follow-up on a skin infection issue. (R. 26). Also, this statement from the notes appears to be nothing more than an off-hand remark regarding the doctor's thoughts on whether Plaintiff should apply for Medicaid. There is no evidence that the ALJ ignored or mischaracterized this evidence, or any other notes by Dr. Aluen.

Regarding Dr. Case, Plaintiff argues that the rheumatologist found her arthritis caused her significant functional limitations, citing in particular findings of reduced ability to use her hands and fingers in his January 2010 and April 2011 examinations. (Doc. 18, at 3; 5). Plaintiff's argument that the ALJ ignored or mischaracterized this evidence, or any other notes by Dr. Case, is also incorrect. Instead, the ALJ accurately summarized Dr. Case's notes in her decision, including that doctor's January 2010 findings that Plaintiff's grip strength was only mildly reduced to 4 out of 5, and April 2011 conclusion that her arthritis was "mild and apparently inactive." (R. 25; 27).

Plaintiff also argues that the ALJ erred by relying on the ME's testimony that Plaintiff's impairments did not meet or equal any listing without "conduct[ing] any analysis of her own." (Doc. 18, at 7-8). As explained above, the ALJ did not rely exclusively on the ME's opinion that Plaintiff's impairments did not meet any listing.

Rather, the ALJ also justified her conclusion by giving her own analysis of the record, which was supported by substantial evidence. And Plaintiff argues that the ALJ erred in according great weight to the ME's opinion that her impairments did not meet any listing, because the ME's testimony focused on Listing 14.09A, and the ME failed to consider Listing 14.09B. (Doc. 18, at 7). However, the ME's testimony shows he considered Plaintiff's arthritis in multiple locations, and considered her other impairments and symptoms, including her hematological conditions, when determining whether her impairments met Listing 14.09. (R. 86-87; 89-93). Although the ME testified more extensively on the requirements of subsection A of that listing, it is clear he did so because her complaints focused on her limitations in fine and gross manipulations. (R. 89-90). The record does not support Plaintiff's argument that the ME only considered Listing 14.09A, or that the ALJ erred in taking the ME's testimony into account.

Finally, Plaintiff argues that the ALJ erred by not discussing whether her hematological conditions and her constitutional symptoms, in combination with the effect of her arthritis on her musculoskeletal system, met the requirements of Listing 14.09B. (Doc. 18, at 5-8). Plaintiff fails to recognize that she must meet "*all* of the specified medical criteria" in a listing to qualify as presumptively disabled. *Zebley*, 493 U.S. at 530. Once the ALJ properly determined that Plaintiff's arthritis did not involve any of body systems to at least a moderate degree of severity, she could not meet Listing 14.09B, regardless of her hematological conditions or other symptoms. Plaintiff admits she only argues that her arthritis involved her musculoskeletal system to at least a moderate degree of severity, as opposed to any of her other systems or organs.

(Doc. 33, at 14). As a result, Plaintiff's argument that the ALJ was required to discuss whether she met the other requirements of Listing 14.09B also fails.

For the foregoing reasons, the ALJ's Step 3 finding was sufficiently explained, supported by substantial evidence, and does not require reversal.

**D.  Medical Opinions**

**1.  Dr. Aluen**

Plaintiff next argues that the ALJ erred in declining to give controlling weight to the February 16, 2010 opinion of her treating physician, Dr. Aluen, and in failing to explain what weight the ALJ gave to that opinion. (Doc. 18, at 8-11, Doc. 33, at 8-10). A treating source opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2); *see Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). An ALJ must offer "good reasons" for discounting a treating physician's opinion, *Scott*, 647 F.3d at 739, and then determine what weight to give it considering (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, and (5) whether the opinion was from a specialist, and (6) other factors brought to the attention of the ALJ. 20 C.F.R. § 404.1527(c)(2)-(6). *See, e.g.*, *Simila*, 573 F.3d at 515.

In this case, the ALJ explained her reasons for declining to give controlling weight to Dr. Aluen's February 16, 2010 opinion in detail, and her reasoning showed a

consideration of the factors required by the regulations. The ALJ began by describing the opinion, including that it was set forth in an attorney-generated questionnaire. (R. 29). The ALJ noted that Dr. Aluen indicated Plaintiff could only stand or walk for 2 hours or less in an 8 hour workday; had significant limitations in handling and fingering due to joint pain; had to be permitted to shift positions at will; and would likely be absent from work for two days or more per month. (*Id.*). The ALJ then explained that although Dr. Aluen had a treating relationship with the Plaintiff, at the time this opinion was rendered, the treatment history was "quite brief." (*Id.*). The ALJ also found that the opinion was "generally not supported" by Dr. Aluen's own treatment notes. (*Id.*).

The ALJ also discounted the weight of Dr. Aluen's opinion because she was an internist, rather than the treating specialist for Plaintiff's arthritis, and some of the doctor's assessments fell outside of her area of expertise. (R. 29-30). The ALJ gave more weight to the assessments of Plaintiff's treating rheumatologist, Dr. Case, regarding her arthritis. (R. 28; 29-30). The ALJ also found that Dr. Aluen relied "heavily" and "uncritically" on Plaintiff's subjective reports of symptoms and limitations, and that the doctor's opinion substantially departed from the rest of the medical evidence in the record. (R. 30). The ALJ further noted that Dr. Aluen may have been motivated, due to sympathy or other reasons, to express an opinion that assisted Plaintiff, and that the disparity between the opinion and the other medical evidence supported that inference here. (*Id.*). The ALJ concluded by stating that Dr. Aluen's opinion could not be given controlling weight because, for the reasons she discussed, it was not well-supported by, or consistent with, the record. (*Id.*).

Plaintiff argues that the ALJ's reasons for discounting Dr. Aluen's opinion were not "good reasons." (Doc. 18, at 9-11). First, she argues that the ALJ improperly discounted Dr. Aluen's opinion because it was given at the request of her counsel, and because it was on a check box form. (*Id.* at 9). But the ALJ's decision does not indicate that she discounted Dr. Aluen's opinion because it was given in a check-box form, or because was requested by counsel. Instead, the ALJ merely described the opinion as being set forth in an attorney-generated functional capacity questionnaire, which was an accurate description. (R. 29). As a result, this argument fails.

Second, Plaintiff argues that the ALJ incorrectly found that Dr. Aluen relied heavily on Plaintiff's subjective complaints, because the doctor actually relied upon objective medical findings. (Doc. 18, at 10; Doc. 33, at 9). In support, Plaintiff cites some of Dr. Aluen's treatment notes and excerpts from other medical records that she claims were available for the doctor's review. (*Id.*). Although Plaintiff admits that the ALJ examined these records and found that Dr. Aluen's opinion was not generally supported by them, Plaintiff argues that the ALJ did not sufficiently explain the basis for her conclusion. (Doc. 18, at 11; *see also* Doc. 33, at 9 (citing *Zurawski v. Halter*, 245 F.3d 881, 889) (ALJ erred by only discussing evidence that favored the denial of benefits, and for not explaining why that evidence outweighed the evidence that supported the claimant)).

Unlike the ALJ in *Zurawski*, the ALJ in this case did not "ignore an entire line of evidence that is contrary to her findings," such as treating physicians' records, or MRIs. *Zurawski*, 245 F. 3d at 888. Instead, the ALJ accurately summarized the portions of the record that Plaintiff claims supported Dr. Aluen's opinion, and compared it to the

evidence that did not, including from Dr. Aluen's own notes. (R. 25-26). As a result, the ALJ's decision reflects a consideration of the record as a whole.

Moreover, the portions of the record that Plaintiff cites in support of her argument do not undermine the supportability of the ALJ's conclusion. For example, Plaintiff cites Dr. Aluen's October and November 2009 findings of synovitis in her ankles, wrists and finger joints, and notes discussing Plaintiff's x-rays, as evidence that the ALJ did not properly assess. (Doc. 18, at 10; Doc. 33, at 9). But the ALJ acknowledged these portions of Dr. Aluen's notes, and also discussed that Dr. Aluen described the x-rays as "unremarkable," found no redness in any of Plaintiff's joints, and recommended only Tylenol #3 when Plaintiff complained of a pain level of 2 out of 10. (R. 25). Plaintiff also cites the emergency room records from February 4, 2010, documenting redness and swelling in Plaintiff's arm and elbow joint, as supportive evidence of Dr. Aluen's opinion. (Doc. 33, at 9). As the ALJ correctly found, this evidence only related to a minor skin infection that Dr. Aluen found was resolving as of February 9, 2010. (R. 26). Plaintiff cites no evidence in support of her argument that was not sufficiently addressed by the ALJ's decision.

Third, Plaintiff argues that the ALJ erred when she conjectured that Dr. Aluen may have been motivated to give an opinion that helped Plaintiff due to sympathy, or some reason other than an "honest, accurate assessment" of Plaintiff's condition. (Doc. 18, at 10-11; Doc. 33, at 9). Relying on *Micus v. Bowen*, 979 F.2d 602 (7th Cir. 1992), she argues that the ALJ's "speculation" was reversible error. (*Id.*). But the *Micus* court acknowledged that an ALJ may consider a treating physician's possible bias for her patient in certain instances, such as when a treating physician's opinion differs from the

opinions of other physicians who "may not share" that bias. 979 F.2d at 607-08. In cases involving "dueling doctors," it is "up to the ALJ to decide which doctor to believe . . . subject only to the requirement that the ALJ's decision be supported by substantial evidence." *Id.* at 608 (citing *Stevens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985)). Here, the ALJ surmised that potential bias might explain the significant contrast between Dr. Aluen's opinion and the rest of the record, including the opinions and findings of Plaintiff's treating rheumatologist, Dr. Case. (R. 30). The Court finds nothing inappropriate in the ALJ's reasoning here.

Next, Plaintiff argues that the ALJ should not have discounted the weight of Dr. Aluen's opinion due to the briefness of the relationship at the time it was given, because the relationship was sufficiently developed for Dr. Aluen to give a reliable opinion. (Doc. 18, at 9-10; Doc. 33, at 8). She further argues that the nature of the treatment relationship, not its length, is determinative, relying on *Schisler v. Bowen*, 851 F.2d 43, 45 (2d Cir. 1988). Plaintiff fails to recognize that the regulations instruct ALJs to consider both the length of the treating relationship, and the nature of the relationship, when evaluating a treating source's opinion. 20 C.F.R. §§ 404.1527(c)(2)(i), (ii). The regulations do not provide that either factor should "trump" the other.

*Schisler* also does not hold that the nature of the treating relationship is more important than the length, as a rule. Rather, the *Schisler* court merely held that the regulations (then in draft form) were not meant to impose any rigid, mechanical rule requiring "a legally fixed period of time" for the formation of a physician-patient relationship. 854 F.2d at 45. The ALJ did not apply any rigid or arbitrary rule here; instead, the ALJ noted that Dr. Aluen had a treating relationship with Plaintiff, but that it

had only existed for about four months at the time she gave her opinion. (R. 29). The ALJ discussed the nature of the treatment relationship up to that point in the decision as well, including the doctor's examinations of Plaintiff; the doctor's evaluation of diagnostic testing; that the doctor was waiting on a "work up" to further evaluate Plaintiff's condition; and the treatments the doctor prescribed. (R. 25-26). Dr. Aluen herself noted that when she gave the opinion, she had only seen Plaintiff five times; certain consultations with specialists and a work-up were still in progress; and it was not clear yet what Plaintiff's condition was or whether it would respond to medication. (R. 442). Based on the foregoing, the ALJ adequately considered the length and nature of Plaintiff's treating relationship with Dr. Aluen, and her findings are supported by the record.

Plaintiff next argues that the ALJ "improperly discounted" Dr. Aluen's opinion on the basis of her specialization as an internist. (Doc. 18, at 10; Doc. 33, at 8-9). She specifically argues that Dr. Aluen was "competent" enough to evaluate the effects of Plaintiff's arthritis. (*Id.*). She further argues that Dr. Aluen's opinion was consistent with the opinion of her treating rheumatologist, Dr. Case, and cites a statement from Dr. Case's April 15, 2011 treatment notes that Plaintiff did not have "usage of her hands." (*Id.*). This argument is factually incorrect; as the ALJ pointed out, although Plaintiff complained to Dr. Case of problems with usage of her hands, including a lack of dexterity and strength, at her April 15, 2011 follow-up, Dr. Case found her arthritis was "mild" and "apparently inactive" that day. (R. 27). Rather than supporting Dr. Aluen's opinion, Dr. Case explicitly wrote that he did not think Plaintiff was disabled, as the ALJ correctly noted. (R. 496).

Also, as the Commissioner argues, the regulations permit the ALJ to "give more weight to the opinion of a specialist about medical issues related to his or her area of specialty." 20 C.F.R. § 404.1527(c)(5). Here, the ALJ noted that Dr. Aluen's opinion "rest[ed] at least in part on an assessment of an impairment outside the doctor's area of expertise," and conflicted with the opinion of the relevant specialist, the rheumatologist Dr. Case. (R. 30). Thus, it appears the ALJ properly considered Dr. Aluen's specialization as one of the factors in evaluating the doctor's opinion.

Finally, Plaintiff argues that, even if the ALJ gave valid, well-supported reasons for not attributing controlling weight to Dr. Aluen's opinion, the ALJ still committed reversible error if she did not state the exact weight given to the opinion. (Doc. 18, at 11; Doc. 33, at 9). Here, the ALJ explained that Dr. Aluen's opinion was due less than controlling weight after properly analyzing the checklist of factors in the regulations. This is sufficient; the ALJ is not required to "state precisely how much weight—beyond 'not controlling'—[s]he places on" the opinion. *Manley v. Barnhart*, 154 F. App'x 532, 536-37 (7th Cir. 2005); *see also Spraggs v. Colvin*, 11 C 1026, 2014 WL 2118823, at *11 (N.D. Ill. May 21, 2014) ("The Seventh Circuit has expressly held that an ALJ may simply state he is giving a controlling physician's opinion 'less than controlling' or 'not controlling' weight so long as the ALJ explains why she is doing so.") (quoting *Manley*, 154 F. App'x at 536); *Elder v. Astrue*, 529 F.3d 408, 412 (7th Cir. 2008) (upholding ALJ's decision to "decline[] to afford 'substantial weight'" to treating physician's opinion since the ALJ minimally articulated his reasons after considering the regulatory factors).

For these reasons, the ALJ did not err in according Dr. Aluen's February 16, 2010 opinion less than controlling weight. Rather, when read as a whole, the ALJ's

decision sets forth a logical bridge from the evidence to her conclusion that is supported by the record. *See Molnar v. Astrue*, 395 F. App'x 282, 287 (7th Cir. 2010) ("We review the ALJ's opinion as a whole to give it the most sensible reading. . . .") (citing *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000)).

### 2. ME Dr. Slodki

Plaintiff also argues that the ALJ erred in according "great weight" to the opinion of the ME, Dr. Slodki, that her subjective allegations were not supported by the record. (Doc. 18, at 11-12; Doc. 33, at 10). An ALJ may "give substantial weight to the testimony of a medical advisor even though the advisor has not examined the claimant personally," so long as that determination is supported by substantial evidence. *DeFrancesco v. Bowen*, 867 F.2d 1040, 1043 (7th Cir. 1989) (citing *Cummins v. Schweiker*, 670 F.2d 81, 84 (7th Cir. 1982)); *see also Ketelboeter v. Astrue*, 550 F.3d 620, 624-25 (upholding ALJ's decision to place more weight on testimony of the non-examining medical experts than the treating physicians because substantial evidence supported the ALJ's decision).

Plaintiff argues that the ALJ ignored certain evidence in the record that contradicted Dr. Slodki's opinion. (Doc. 18, at 12; Doc. 33, at 10). She specifically cites Plaintiff's August 27, 2009 emergency room records discussing her decreased range of motion and strength in the left wrist, and Dr. Case's January 27, 2010 notes stating she was unable to fully flex her fingers and had a decreased range of motion in her wrists and ankles. (*Id.*). Rather than ignoring this evidence, the ALJ expressly discussed both of these records, including most of the findings Plaintiff focuses on. (R. 24-25). As the

ALJ noted, Plaintiff's physicians described the x-rays taken of Plaintiff's left wrist in response to her decreased range of motion and strength as "unremarkable." (R. 25-26). And, although Plaintiff described some limitations in January 2010, Dr. Case also noted her grip strength was only mildly reduced and her pain was controlled with paraffin wax and ibuprofen. (R. 25). The ALJ's decision reflects a consideration of the entire record, including the evidence Plaintiff cites, in determining to accord great weight to Dr. Slodki's opinion, and her decision is supported by substantial evidence.

### 3. DDS Examiner Dr. Andrews

Plaintiff argues that the ALJ erred in failing to apply the regulatory factors when determining to adopt a portion, and reject a portion, of DDS examiner Dr. Andrews' March 15, 2010 opinion. (Doc. 18, at 13-14; Doc. 33, at 10). ALJs are required to evaluate the opinions of state agency physicians based on the relevant factors described in the regulations, including the physician's expertise in the SSA's rules and regulations, the supporting explanation for the opinion, and the other evidence in the record. *See* 20 C.F.R. § 404.1527(e)(2). Furthermore, ALJs must "explain the weight given to the opinions [of state agency physicians] in their decisions." *McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011) (quoting S.S.R. 96-6p, 1996 WL 374180, at *1).

Here, the ALJ's explanation of her evaluation of Dr. Andrews' opinion consists of one sentence. (R. 30). The sentence states that the ALJ "generally agree[s] with the exertional level Dr. Andrews presented, but find[s] that subsequent records support that the claimant is further restricted" in certain respects, which the ALJ then lists. (*Id.*). The

Court agrees with Plaintiff that this explanation for the weight accorded to Dr. Andrews' opinion is insufficient and requires reversal.

The Commissioner notes that state agency consultants are "highly qualified physicians" and "experts in Social Security disability regulations," and that the ALJ could have determined to adopt Dr. Andrews' opinion in its entirety, rather than just in part. (Doc. 29, at 8-9 (citing 20 C.F.R. § 404.1527(e)(2)(i))).   But this argument fails to address whether the ALJ sufficiently explained her decision so that a reviewing court could determine if she complied with the regulations and whether her conclusion is supported by substantial evidence.  The Commissioner also noted that the ALJ at least explained that she considered the record and determined that Plaintiff was more limited than Dr. Andrews found.  (*Id.*).   Since consistency with the record is one of the regulatory factors for evaluating medical opinions, the Commissioner argues that the ALJ properly evaluated the opinion according to the regulations, and did not err.  (*Id.* (citing 20 C.F.R. § 404.1527(c)(4))).

As Plaintiff points out, this argument fails to address the lack of explanation in the decision regarding why the ALJ found the record supported certain additional limitations for Plaintiff, but not others.  (Doc. 18, at 15; Doc. 33, at 10).  Also, the ALJ's statement that "subsequent records" supported finding her more limited than Dr. Andrews opined in March 2010 appears to contradict her other findings that Plaintiff's 2011 records showed improvement in her condition.  (R. 28).  Finally, as Plaintiff argues, these logical gaps in the ALJ's analysis of Dr. Andrews' opinion also affected the supportability of the ALJ's RFC determination, and this case requires reversal to address those issues, as discussed further below.

## E.    RFC

Based on some of the reasons discussed above, as well as certain other reasons, Plaintiff argues that the ALJ erred in determining her residual functional capacity ("RFC"). (Doc. 18, at 14-17). "Residual functional capacity" is defined as "the most [the claimant] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a). "When determining the RFC, the ALJ must consider all medically determinable impairments, . . . even those that are not considered 'severe.'" *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008). "[T]he responsibility for the RFC assessment belongs to the ALJ, not a physician, [but] an ALJ cannot construct his own RFC finding without a proper medical ground and must explain how he has reached his conclusions." *Amey v. Astrue*, No. 09 C 2712, 2012 WL 366522, at *13 (N.D. Ill. Feb. 2, 2012) (citations omitted). *See also* 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2). First, Plaintiff argues that the ALJ erred in rejecting the RFC determination set forth by Dr. Aluen in her February 16, 2010 opinion. (Doc. 18, at 14). For the reasons set forth above, the ALJ did not err in declining to accord controlling weight to any part of Dr. Aluen's opinion, including that doctor's RFC determination.

Plaintiff also argues that the ALJ failed to consider her hematologic conditions, in combination with her other impairments, when determining her RFC. (Doc. 18, at 14, 16-17; Doc. 33, at 10-11, 13). She specifically argues the ALJ ignored evidence of the symptoms caused by her hematologic conditions, including fatigue, lethargy, malaise, stiffness, hair loss, and iron deficiency. (*Id.*). The decision shows the ALJ did not ignore this evidence; it contains numerous references to Plaintiff's complaints of stiffness in various body parts and joints, soreness, drowsiness, body aches, lethargy,

and fatigue, including several of the statements she claims the ALJ overlooked. (R. 23-27). The ALJ also noted Plaintiff's diagnoses of anemia and leukopenia, and her treatment with the Stroger Hematologic Clinic. (R. 24; 26-27). Plaintiff is correct that the ALJ finding that Plaintiff's postmenopausal bleeding caused her anemia lacks support; the record shows Plaintiff's doctors thought the bleeding was benign and not the cause of her anemia. (Doc. 18, at 16-17; *see also* R. 22; 476; 482; 488). Although the ALJ made a minor factual error regarding the cause of Plaintiff's anemia, the decision shows she still considered the fact that Plaintiff had the condition when determining the RFC. Thus, Plaintiff has not shown that the ALJ ignored her hematological conditions, or the symptoms she alleges were caused by those conditions.

Plaintiff further argues that, to the extent the ALJ considered the evidence related to her hematological conditions, the ALJ erred by failing to include any limitations caused by those conditions in the RFC. (Doc. 33, at 10-11, 13). But Plaintiff does not identify any limitations that the ALJ failed to include in the RFC. Nothing in the record, including the excerpts Plaintiff cites, suggests that the ALJ overlooked any functional limitations caused by these conditions.

Plaintiff's argument that the ALJ erred in "construct[ing] a 'middle ground' RFC" by making her own independent medical determination of Plaintiff's limitations, has some merit. (Doc. 18, at 14-16). As Plaintiff argues, two aspects of the ALJ's RFC determination appear to lack sufficient explanation and support. First, the ALJ rejected the physical RFCs in the record concerning Plaintiff's use of her hands: Dr. Aluen's opinion that she had significant manipulative limitations, and Dr. Andrews' opinion that

she had no manipulative limitations.  (R. 29; 30).  The ALJ then "constructed a 'middle ground'" and determined that Plaintiff could frequently perform fine and gross manipulations.  *Bailey v. Barnhart*, 473 F. Supp. 2d 822, 838 (N.D. Ill. 2006).  The ALJ gives no explanation of the evidence supporting this finding, other than to comment that "subsequent records" after Dr. Andrews' March 15, 2010 opinion support it.  (R. 30).

As noted above, this explanation appears to contradict the ALJ's other findings that Plaintiff's most recent medical records showed improvement in, particularly, her arthritis.  (R. 28).  And, as Plaintiff argues, this brief explanation suggests that the ALJ made her own independent medical evaluation regarding the degree of Plaintiff's impairments, based on some, unspecified, portions of the record.  As a result, it appears the ALJ "impermissibly played doctor" here, requiring reversal of the RFC determination.  *Bailey,* 473 F. Supp. 2d at 839 (citing *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)).

The Commissioner argues that the ALJ was not required to rely on or choose any particular medical opinion in determining the RFC, and thus did not err by "craft[ing] an RFC assessment based on the entirety of the record."  (Doc. 29, at 9-10).  The Commissioner cites *Schmidt v. Astrue*, 496 F.3d 833 (7th Cir. 2007) and *Diaz v. Charter*, 55 F.3d 300 (7th Cir. 1995), in support, but those cases are distinguishable from this case.  In *Diaz*, the ALJ supported the RFC determination by relying on both opinion evidence and non-medical evidence, and the Seventh Circuit rejected an argument that the ALJ should have relied solely on physicians' opinions when determining a claimant's RFC.  55 F.3d at 306-07, n.2.  And in *Schmidt*, the ALJ did not err in determining the claimant's RFC by weighing physicians' opinions along with the

testimony and other evidence, rather than adopting an RFC that was determined by any single physician.  496 F.3d at 845.

In this case, the ALJ does not explain what evidence from the record supported her RFC finding.  Thus, it appears the ALJ developed her own opinion regarding Plaintiff's manipulative limitations, which she cannot do.  *See Suide v. Astrue*, 371 Fed. App'x. 684, 690 (7th Cir. 2010) (ALJ cannot user her own lay opinion to "fill evidentiary gaps in the record") (citing *Blakes v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003)).  On remand, the ALJ must articulate sufficient support for her RFC determination, including regarding Plaintiff's manipulative limitations.

Second, as Plaintiff argues, the ALJ's explanation regarding her finding that Plaintiff could lift or carry 20 pounds occasionally and 10 pounds frequently, and could stand, walk or sit for up to 6 hours in an 8 hour workday, is also lacking.  (Doc. 18, at 14-15).  The ALJ states that she made this finding because she "generally agree[d] with the exertional level Dr. Andrews presented," but, as discussed above, fails to explain why she thought the record supported Dr. Andrews' finding in this respect, but not the doctor's other findings.  (R. 30).  The ALJ merely states that "subsequent records support that the claimant is further restricted," but does not explain why, for example, those records support a finding of greater restrictions in climbing stairs than Dr. Andrews found, but not in standing or walking.  (*Id.*).  On remand, if the ALJ chooses to rely on Dr. Andrews' opinion for determining any portion of Plaintiff's RFC, she must explain why, consistent with the requirements of the SSA's rulings and regulations.

**F.     Credibility**

Plaintiff also argues that the ALJ erred in finding that her testimony was "not credible" to the extent it was "inconsistent with, and not supported by, the objective medical record as discussed."  (Doc. 18, at 17-22; Doc. 33, at 2-7).   In assessing a claimant's credibility, an ALJ must first determine whether the claimant's symptoms are supported by medical evidence.  *See* SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007).   If not, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record."  *Arnold*, 473 F.3d at 822.  S*ee also* 20 C.F.R. § 404.1529; *Carradine v. Barnhart*, 360 F.3d 751, 775 (7th Cir. 2004).   An ALJ's credibility determination must contain specific reasons for the credibility finding that are supported by evidence in the record, but the credibility determination will normally be reversed only if "patently wrong."  *Craft*, 539 F.3d at 678; *Schreiber v. Colvin*, 519 F. App'x 951, 960 (7th Cir. 2013).    Although, as the Commissioner notes, the ALJ gave many reasons for discrediting Plaintiff's testimony, a number of them are concerning.

The ALJ found that Plaintiff did not take her prescribed medications as required, and cited several instances of non-compliance in the record.  (R. 28).  As Plaintiff argues, however, it is not clear that the ALJ considered her reasons for non-compliance, including her statements in the record that certain medications did not help her pain, had unpleasant side effects, or were too expensive to purchase.  (Doc. 18, at 20).  ALJs

must not "draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide." *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013) (citations omitted). The ALJ did note that the ME testified that some of Plaintiff's medications were decreased due to side effects. (R. 30). But the ALJ did not discuss the impact of this testimony on her finding. The Commissioner also notes that the ALJ cited a couple of instances in the record where Plaintiff gave no explanation for failing to refill her medications. But the ALJ did not ask Plaintiff whether she had any reason for failing to purchase her medications in those instances, before drawing a negative inference based on them. This lack of discussion concerning the reasons for Plaintiff's non-compliance undermines the ALJ's credibility determination.

The ALJ also discounts Plaintiff's credibility because of a "reduced frequency of treatment in 2011" and states that this reduced treatment suggests Plaintiff did not require or avail herself of "treatment one would expect for a totally disabled individual." (R. 28). In support, the ALJ cites Plaintiff's failure to follow up with Dr. Case between late September 2010 and mid-April 2011. (*Id.*). The ALJ also cites several instances when Plaintiff missed appointments, including appointments for her endometrial biopsy, colonoscopy, and CT scan. (*Id.*). However, as with Plaintiff's non-compliance with her medications, the ALJ must not draw a negative inference based on these missed appointments or failures to follow-up with her physicians without considering any reasons for these issues. *See Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("Although a history of sporadic treatment or the failure to follow a treatment plan can undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for

the lack of medical care before drawing a negative inference.") (citing S.S.R. 96–7p, 1996 WL 374186, at *7; *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009); *Craft,* 539 F.3d at 679).

The record contains explanations for several of the instances in missed treatments that the ALJ cited, including that Plaintiff's sister accidentally cancelled her CT scan appointment, and that she was confused about the date regarding her endometrial biopsy. (R. 367; 502). Both appointments were rescheduled and properly attended. (R. 255; 261; 488). The ALJ did not discuss any of these explanations, or ask Plaintiff about her other missed appointments. Some of Plaintiff's follow-up appointments, including a few that the ALJ described Plaintiff as missing, were actually cancelled and rescheduled by her doctors, not Plaintiff. (R. 333; 398; 495). As a result, this finding must also be re-visited by the ALJ should she choose to rely upon it on remand.

The ALJ also noted several "discrepancies" in the record that she thought were indicative of symptom exaggeration, but some of these findings were problematic. (R. 28-29). For example, the ALJ stated that there was a discrepancy between Plaintiff's testimony that she could walk about two blocks when her arthritis in the feet and ankles flares up, and her May 2011 statement to Dr. Aluen that she could walk for about 10 minutes without stopping. (R. 29). But, Plaintiff's statement to Dr. Aluen regarding her ability to walk for 10 minutes related to her ability to walk when feeling well. (R. 481). She stated to Dr. Aluen, and other physicians, that "flare ups" sometimes affected her ability to walk, including by causing her to walk "slowly" or by limiting her to walking

about two blocks before needing to rest. (R. 267; 443; 481). There does not appear to be support for finding a discrepancy here.

The ALJ also noted that Plaintiff described stiffness and pain in her wrists, but apparently handwrote her function reports. (R. 29). But the ALJ never asked Plaintiff whether she wrote the reports herself, whether she had assistance, or whether she had problems writing those reports. Variations in the handwriting on the reports from page to page suggest Plaintiff may have had help or worked on them over several days. (R. 199-209; 229-237). As a result, this finding also lacks support in the record.

Finally, the ALJ noted that Plaintiff's affirmation of her ability to work to the state unemployment authorities, while alleging that she cannot work during the same period of time to the SSA, undermines her credibility. (R. 29). Plaintiff argues that she was only able to work at a sedentary or part-time level, which would have allowed her to be eligible for unemployment benefits and DIB benefits. (Doc. 18, at 21-22). An ALJ may "consider any representations [the claimant] has made to state authorities and prospective employers that he can work" when evaluating credibility. *Knox v. Astrue*, 327 F. App'x 652, 656 (7th Cir. 2009) (citing *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005)). This could include evidence that a claimant applied for more strenuous positions than other potential jobs, or told prospective employers that he was capable of certain job duties. *Id.* Although the ALJ asked Plaintiff about what kinds of jobs she applied for, the ALJ did not discuss Plaintiff's answers, or her job applications, in the decision. If the ALJ chooses to rely on this factor in evaluating Plaintiff's credibility on remand, the ALJ should more explicitly discuss these issues.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment (Doc. 18) is granted, and Defendant's Motion for Summary Judgment (Doc. 28) is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

ENTER:

Dated: September 5, 2014

SHEILA FINNEGAN
United States Magistrate Judge